MATTER OF M/V "OCEANIC PEACE"

In Fine Proceedings

NYC–10/52.1962

*Decided by Board February 14, 1972*

(1) Where a vessel, following arrival and crew inspection at Los Angeles sailed for New York via the Canal Zone making a port call in Balboa, Canal Zone for the purpose of transaction of ship's business (sign on a replacement engineer), such vessel upon arrival at New York was arriving from foreign and, therefore, subject to all the requirements of the immigration laws.

(2) Hence, liability to fine for failure to detain on board for inspection lies under section 254(a)(1), Immigration and Nationality Act, as to the six crewmen reported by the carrier (Forms I–418) to have deserted the ship after its arrival at New York (sec. 254(b)). As to the remaining 36 alien crew members, fine does not lie under section 254(a)(1) of the Act in the absence of affirmative evidence that they did, in fact, leave the vessel before inspected.

BASIS FOR FINE: Act of 1952—Section 254(a)(1) [8 U.S.C. 1284]

IN RE: M/V "OCEANIC PEACE," which arrived at the port of New York, from the Canal Zone, on October 19, 1969. Alien crewmen involved: HUI SIN HO, Master and 41 others

ON BEHALF OF CARRIER: John J. Quigley, Jr., Esquire
26 Broadway
New York, New York 10004

This appeal is directed to an administrative penalty of $42,000, $1,000 as to each of the alien members of the crew of the vessel, including its Master, which the District Director has ordered imposed on the vessel's owner, agent, charterer, or consignee, ASCA Marine Corporation, for failure to detain the crewmen aboard the vessel until they had been inspected by an immigration officer. The penalty will be reduced to $6,000, for the reasons hereinafter set forth.

The vessel arrived at the port of Los Angeles, California, from foreign, on October 1, 1969. Immigration inspection was then and there accorded its crew. While the vessel was still in the port of Los Angeles, the chief engineer had to leave the ship because of illness.

The vessel sailed from Los Angeles for New York, by way of the

Canal Zone. On October 12, 1969, it made a three-hour port call in Balboa, Canal Zone. The purpose of that port call was to sign on a replacement engineer, Chen Chon Shai.

The ship then proceeded to New York, arrived at anchorage there on October 19, 1969, and proceeded to the Yonkers Sugar Refinery Docks, Yonkers, New York, on October 21, 1969. The Master then entered and cleared his vessel for Customs purposes. He did not, however, request immigration inspection and none was made. The vessel proceeded coastwise from New York to Baton Rouge, Louisiana, and Los Angeles, California. The departure manifests (Forms I-418) filed at those ports indicate that the following Chinese crewmen deserted the ship in the United States after its arrival at New York: Chung Pak Hop, Kwok Kam Yuen, Lam Yat Kuen, Wong Chi Chung, Chin Kwong and Chung Nam Sang.

The carrier's basic contention, which we reject, is that any immigration fine to be imposed here must be limited to a failure solely with respect to the crewman signed on at Balboa, Canal Zone. The answer to this argument, simply stated, is that ports in the Canal Zone are foreign ports. Any vessel calling at them is required to enter and clear formally. And when it subsequently enters a United States port, it is deemed to be arriving from foreign. It is, therefore, then subject to all the requirements of the immigration laws.

Exceptions to the foregoing have traditionally been made where a vessel entered a port in the Canal Zone solely for the purpose of passing in transit, bunkering, or landing a crewman for medical treatment. But no such exclusions have been made where the purpose of the port call was the transaction of ship's business, *e.g.*, taking on or discharging cargo, passengers, or crew members. This case falls clearly within the last mentioned category.

The carrier's awareness of the true situation can be found in the fact that it requested Customs inspection in New York. Also, its foregoing argument appears to concede the point, albeit to a limited extent. But most important, the following record evidence dispels any doubts we might otherwise have had on the point.

On October 3, 1969, A. Levkovitch, Operations Manager, Orient Maritime Agencies, Los Angeles, California, sent a memorandum to Wilford and McKay, Inc., agents at Balboa, Canal Zone, requesting information on the transactions of the vessel in the Canal Zone. The Balboa agents replied by way of a "Note" added to Mr. Levkovitch's memorandum which reads, as follows: "Business transactions at Canal. Chen Chon Shai—Chief Engineer who arrived on PAA 517 was signed onboard vessel in Balboa." The text of the memorandum renders it abundantly clear that the parties

responsible for the vessel's operation were fully aware that this "business transaction" made complete compliance with the immigration laws necessary at the vessel's next United States port of call.

In connection with the foregoing, the California agents received the reply from the Canal Zone agents on October 16, 1969. This was three days before the vessel arrived at anchorage in New York, and five days before it docked at that port. Under these circumstances, we find no valid excuse for the failure to have the New York agents and/or the Master, if he actually was unaware of the requirement, informed of the necessity of immigration inspection at that port. Again, support for this finding, if such be necessary, can be derived from the fact that Customs inspection was requested there.

It is our conclusion, based on the foregoing, that liability to a penalty of $6,000 has been established, *i.e.*, a fine of $1,000 as to each of the alien crewmen named above as having deserted the ship after its arrival at New York. The reports (manifests and crew list) of the carrier itself show that they did not sail foreign with their vessel. Thus, the provisions of section 254(b) are operative as to them. In other words, a *prima facie* case for imposition of fines based on failure to detain them for inspection has been established. The Service does not have to show otherwise that they did, in fact, leave the vessel.

The contrary, however, is true with respect to the other thirty-six (36) alien members of the ship's crew. Under section 254(a)(1) of the Act, a fine for failure to detain an alien crewman on board until he has been inspected by an immigration officer does not lie for merely failing to present him for inspection. Accordingly, the Government has the burden, other than as indicated above, of establishing by affirmative evidence that the crewman did, in fact, leave the vessel before he was inspected, *Matter of M/V "Pacific Ocean*, 11 I. & N. Dec. 475 (BIA, 1966), and we find no such evidence as to 36 members of this ship's crew.

On this point, the alleged violations occurred in October of 1969, and these proceedings were instituted on December 10, 1970. Hence, the Service has already had adequate opportunity to make its case, but has failed to do so. But, in the unlikely event it can and does develop appropriate evidence, it will then have available an adequate remedy by way of a motion for reconsideration.

Finally, there remains only the question of mitigation of the fines we have found properly imposed. As indicated above, the carrier's failure to detain the six (6) deserters until they had been inspected cannot reasonably be considered unintentional because of lack of awareness of the requirement therefor, or traceable to

lack of an opportunity to request inspection in timely manner. All we need add is that no claim has been advanced or showing made that the carrier took any precautions to prevent desertions, despite the fact that the manifests show several crew members were refused landing privileges at the time of initial inspection at Los Angeles. We conclude, therefore, that no mitigation of the penalty incurred is merited.

**ORDER:** It is ordered that the District Director's decision of September 16, 1971, be amended to provide for the imposition of a penalty of $6,000, $1,000 as to each of the six (6) alien crewmen reported by the carrier to have deserted the ship after its arrival in New York, and that as so modified the decision of the District Director be and the same is hereby affirmed. The penalty of $36,000 ordered imposed by the District Director as to the thirty-six (36) crewmen not shown to have gone ashore at New York or thereafter is *not* sustained.